## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

RANDY AND MARY WILLIAMS and
LARRY AND LINDA LAKE,

      Plaintiffs, on behalf of a
      Putative Class,

v.

NATIONAL UNION FIRE
INSURANCE COMPANY OF
PITTSBURGH, PA;
HEALTHEXTRAS, INC.;
HEALTHEXTRAS, LLC; and
CATAMARAN HEALTH
SOLUTIONS, LLC,

      Defendants.

CASE NO.: 1:14-cv-00309-TWT

CLASS ACTION

## AMENDED COMPLAINT

Now come the Plaintiffs, Randy and Mary Williams, Larry and Linda Lake,

on behalf of themselves and all other similarly situated residents of the State of

Georgia and allege as follows:

1.      Plaintiffs, Randy and Mary Williams, are residents of Douglas

County, Georgia, and Larry and Linda Lake, residents of Fayette County, Georgia,

who purchased insurance coverage advertised under the name HealthExtras that

purportedly provided them with a One Million Dollar ($1,000,000.00) lump sum Accidental Permanent and Total Disability Benefit in the event that the named insured became permanently disabled and could not return to work, underwritten by National Union Fire Insurance Company of Pittsburgh, PA, and a Two Thousand Five Hundred ($2,500.00) Emergency Accident and Sickness Medical Expense Benefit underwritten by Virginia Surety Company, Inc.

2.     Defendant National Union Fire Insurance Company of Pittsburgh, PA, d/b/a National Union Fire Insurance Company, a member of American International Group, Inc. (AIG), (hereinafter National Union), was and is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania and has done business at all relevant times in the State of Georgia, with its principal office located at 175 Water Street, 18th Floor, New York, NY 10038, and with its registered agent located in Pennsylvania, namely, Corporation Service Company, 2595 Interstate Drive, Harrisburg, PA 17710.  National Union has a local agent for service of process, namely, Corporation Service Company, located at 40 Technology Parkway South, #300, Norcross, GA 30092. Upon information and belief, Defendant National Union, at all times relevant to this action, was licensed as an insurance company and/or underwriter in the State of Georgia.

3.     Defendant HealthExtras, Inc., was and is a corporation organized and existing under the laws of the State of Delaware and has done business at all relevant times in the State of Georgia, with its registered agent located in Delaware, namely, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.  Defendant HealthExtras, Inc. has asserted that on October 1, 2008, it changed its name to Catalyst Health Solutions, Inc., and therefore, it no longer exists.  However, HealthExtras, Inc. continued to operate under the name of HealthExtras and conduct business, service and administer the disability policies that are the subject of this lawsuit until August 1, 2012.  Defendant HealthExtras, Inc. was never licensed or authorized by the Georgia Secretary of State to conduct business in Georgia or the Georgia Department of Insurance to conduct insurance transactions in Georgia, including the marketing and sale of insurance products in Georgia.

4.     Catalyst Health Solutions, Inc., the corporate successor to HealthExtras, Inc., was purchased by SXC Health Solutions in July 2012.  Those companies merged together to form Defendant, Catamaran Health Solutions, LLC. Catamaran is a limited liability company organized and existing under the laws of the State of Delaware and has done business at all relevant times in the State of Georgia, with its registered agent located in Delaware, namely, The Corporation

Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.  Neither Catalyst Health Solutions, Inc. nor Catamaran Health Solutions, LLC have ever been licensed or authorized by the Georgia Secretary of State to conduct business in Georgia or the Georgia Department of Insurance to conduct insurance transactions in Georgia, including the marketing and sale of insurance products in Georgia.  These entities are sometimes referred to as the "Catamaran Defendants."

5.     HealthExtras, LLC is a limited liability company, formed and organized under the laws of the State of Delaware by officers and directors of HealthExtras, Inc., and Catalyst Health Solutions, Inc., in October 2010.  In July 2012 HealthExtras, LLC, was owned and operated by Catamaran Health Solutions, LLC, as the successor corporation of HealthExtras, Inc. and Catalyst Health Solutions, Inc.  On August 1, 2012 Catamaran sold HealthExtras, LLC to a different entity and caused the HealthExtras disability policies that are the subject of this lawsuit to be transferred to it for servicing and administration.  The president of HealthExtras, LLC, Mark Nardone, was formerly a Vice President of Catalyst Health Solutions, Inc.  HealthExtras, LLC continues to operate under the name HealthExtras. HealthExtras, LLC has a registered agent located in Delaware, namely, The Corporation Trust Company, Corporation Trust Center, 1209 Orange

Street, Wilmington, DE 19801.  HealthExtras, LLC currently administers, collects and allocates premiums for the insurance program complained of herein.

6.     HealthExtras, Inc., Catalyst Health Solutions, Inc. and Catamaran Health Solutions, LLC are successor entities, each of which has utilized the name "HealthExtras" in their operations.  Because each of these entities refer to itself as HealthExtras or utilize the name "HealthExtras" in conducting their business, Plaintiffs cannot distinguish between them in every instance of discovery since they did not always distinguish between themselves.  Consequently, HealthExtras, Inc., Catalyst Health Solutions, Inc. and Catamaran Health Solutions, LLC are referred to herein as "Catamaran Defendants."

## **JURISDICTION, VENUE AND CHOICE OF LAW**

7.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because there are 100 or more Class Members and the aggregate amount in controversy exceeds Five Million Dollars ($5,000,000.00) exclusive of interest and costs. Additionally, at least one Class Member is a citizen of a state different from the corporate domiciles of the Defendants.

8.     This case is properly maintainable as a class action pursuant to and in accordance with Rule 23(a) of the Federal Rules of Civil Procedure in that:

a) The class, which includes an unknown number of persons but certainly more than 100, is so numerous that joinder of all members is impractical;

b) There are substantial questions of law and fact common to the class including those set forth in greater particularity herein; and

c) Questions of law and fact enumerated below, which are all common of the class, predominate over any questions of law or fact affecting only individual members of the class;

d) A class action is superior to any other type of action for the fair and efficient adjudication of the controversy;

e) The relief sought in this class action will effectively and efficiently provide relief to all members of the class; and,

f) There are no unusual difficulties foreseen in the management of this class action.

9.      The Defendants, collectively and individually, at all relevant times herein conducted substantial business in this district, many of the violations occurred in this district, and many of the acts and transactions alleged in this Complaint occurred in this district.

10.     The Court has personal jurisdiction over all the Defendants, who have at least minimum contacts with the State of Georgia because the Defendants conduct business there and have availed themselves of Georgia markets through its promotion, sales and marketing efforts, as well as the Defendants' issuance of insurance policies and collection of premiums within Georgia to and from residents of Georgia.

11.     This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

12.     Georgia's substantive laws may be constitutionally applied to the claims of Plaintiffs and the Class under the Due Process Clause, 14th Amendment, Section 1, and the Full Faith and Credit Clause, Article IV, Section 1, of the U.S. Constitution. Georgia has a significant contact, or significant aggregation of contacts, to the claims asserted by Plaintiffs, thereby creating state interests that ensure that the choice of Georgia state law is not arbitrary or unfair.

13.     The Defendants' actions and omissions of which Plaintiffs complain were directly targeted at residents of Georgia and are in derogation of the State of Georgia's interest in the regulation of products sold and administered within the state.  Georgia has an interest in regulating the Defendants' conduct in marketing, selling, collecting premiums for and administering insurance products within its

borders to its residents and in preventing fraud and other misconduct being committed against those residents.

14.     Georgia residents were the target of these Defendants' marketing, selling, collecting premiums for and administration of insurance, and the Defendants' misconduct injured and affected Plaintiffs and the Class Members residing in Georgia.

15.     Accordingly, the application of Georgia's laws to the Plaintiffs and proposed Class Members is appropriate under Georgia's choice of law rules because Georgia has significant contacts to the claims of the Plaintiffs and all members of the proposed Class, and Georgia has a greater interest in applying its laws here than any other State.

16.     Venue in the United States District Court for the Northern District of Georgia is proper because Defendants transact business within this District and a substantial part of the events giving rise to the claims at issue in this Complaint occurred in this District.

17.     Georgia's substantive laws apply to the proposed Class, as defined herein, because Plaintiffs properly brings this Class Action Complaint in this District alleging violations of Georgia law, as well as federal statutory claims.

## PRELIMINARY ALLEGATIONS

18.     This matter is governed by the law of the State of Georgia and the United States of America.  This matter is not governed by ERISA, 29 U.S.C. § 1001, *et seq*.

19.     This action arises from the wrongful conduct of the Catamaran Defendants, HealthExtras, LLC, and National Union toward the Plaintiffs and others similarly situated in the State of Georgia and the United States of America. Its wrongful conduct included a scheme (hereinafter the "HealthExtras Scheme") which involved fraudulent advertising, marketing, and sale of purported group or blanket insurance for Georgia residents who were not members of any group for which such an insurance product was authorized.  This purported insurance coverage was marketed and sold to Georgia residents for over a decade, despite the knowledge by each Defendant that the product was illegal in the purported insurance coverage held pursuant to the HealthExtras Scheme is fraudulent and illusory, in that there was no present intention to pay claims under that purported coverage.

20.     HealthExtras Scheme has operated in Georgia for over a decade and continues to this day.  The Defendants have also participated in similar schemes in other states.

21.     Defendants are jointly and severally liable for the wrongful conduct alleged herein.

22.     This case seeks recovery of all premiums, treble and punitive damages, interest as well as injunctive and other equitable relief, attorneys' fees and costs, including costs of investigation reasonably incurred, and other damages.

## CLASS ALLEGATIONS

23.     Plaintiffs, Randy and Mary Williams, and Larry and Linda Lake, bring this action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves and as representatives of a Class of individual residents of the State of Georgia who owned, purchased or paid premiums for disability insurance coverage with Defendants for disability insurance product known as "HealthExtras" from April 1, 2000 through the date of class certification.

24.     Plaintiffs, Randy and Mary Williams, and Larry and Linda Lake, bring this action as class representatives to recover damages and/or refunds from these Defendants for (a) Unjust Enrichment and (b) violation of O.C.G.A. §§ 16-14-*1 et. seq*. (GA RICO).

25.     This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of the Federal Rules of Civil Procedure Rule 23(a)(1-4) and (b)(1).

26.     The Plaintiffs Class is defined and proposed as follows: All individual persons in the State of Georgia who own, owned and/or purchased disability insurance coverage and/or paid premiums for disability insurance known as HealthExtras with the Defendants from April 1, 2000 through the date of class certification.  Collectively, these persons will be referred to as the "Class".

27.     Plaintiffs reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

28.     Excluded from the Plaintiffs Class are:

(a)     Defendants and any entities in which any Defendant has a controlling interest;

(b)     Any entities in which Defendants' officers, directors, or employees are employed and any of the legal representatives, heirs, successors or assigns of any Defendants;

(c)     The Judge to whom this case is assigned and any member of the Judge's immediate family and any other judicial officer or employees assigned to this case;

(d)     Claims for personal injury, wrongful death and/or emotional distress;

(e)  Actual identifiable claims for disability benefits that have already arisen that may be payable under the terms of said disability insurance policies;

(f)  Whether Defendants breach a duty of good faith and fair dealing;

(g)  Any attorneys representing the Plaintiffs or the Class;

(h)  All governmental entities; and,

(i)  Any person having entered into a release of claims with the Defendants concerning these allegations prior to the certification of this class.

29.  Numerosity.  Fed. R. Civ. P. 23(a)(1).  The Class Members are so numerous that their individual joinder is impracticable.  The exact number or identification of the Class Members is presently unknown, but it is believed that there are over 100 and most likely thousands of Class Members.  The identity of the Class Members is ascertainable.  In addition to registration rolls maintained by the Defendants, the Class Members may be located and informed of the pendency of this action by a combination of electronic bulletins, e-mail, direct mail and public notice, or other means.

30.     Predominance of Common Questions.  Fed. R. Civ. P. 23(a)(2),
23(b)(3).  Common questions of law and fact exist as to all the Class Members and
predominate over questions affecting only individual Class Members.  These
common questions include the following:

(a)     Whether Defendants sold disability policies and collected

premiums for said insurance policies that were illegal under the

law of the State of Georgia;

(b)     Whether Defendants illegally sold disability policies and

collected premiums for those policies to a group of Georgia

residents that was not and could not be a legal "blanket group"

under Georgia law;

(c)     Whether Defendants wrongfully increased premiums for those

illegal policies;

(d)     Whether Defendants knew or should have known that selling

and collecting premiums for the subject policies was illegal

pursuant to applicable Georgia law and in derogation of the

State of Georgia's interest in regulating the sale of insurance

within its borders;

(e)     Whether the Defendants have been unjustly enriched at the expense of Plaintiffs and the Class Members;

(f)     Whether Plaintiffs and the Class Members suffered any injury that was proximately caused by the unlawful acts alleged herein;

(g)     Whether the Defendants acted in conspiracy with each other to perform the illegal acts described herein; and,

(h)     Whether Plaintiffs and the Class Members are entitled to recover damages proximately caused by the alleged unlawful conduct, including damages recoverable under Georgia RICO, O.C.G.A. § 16-14-1, *et seq.*, punitive damages, interest, injunctive relief, attorneys' fees, and costs, including reasonable costs of investigation, and other damages.

31.     Typicality. Fed. R. Civ. P. 23(a)(3).  Plaintiffs' claims are typical of claims of all of the Members of the Class, all of whom owned or purchased disability insurance coverage or paid premiums for disability coverage through a program known as HealthExtras from April 1, 2000 through the present date.

32.     Adequacy. Fed. R. Civ. P. 23(a)(4); 23(g)(1).  Plaintiffs are adequate representatives of the Class because they fit within the class definition and their

interests do not conflict with the interests of the Members of the Class they seek to represent.  Plaintiffs will prosecute this action vigorously for the benefit of the entire Class, they agree to participate in discovery and attend any Court hearings required of them.  Plaintiffs are represented by experienced and able attorneys from coordinated law firms that will collectively and jointly serve as Class Counsel.  Class Counsel has litigated numerous class actions, and Plaintiffs' counsel intends to prosecute this action vigorously for the benefit of the entire Class.  Plaintiffs and Class Counsel can fairly and adequately protect the interests of all of the Members of the Class.

33.     Superiority.  Fed. R. Civ. P. 23(b)(3).  The class action is the best available method for the efficient adjudication of this litigation because individual litigation of Class Members' claims would be impracticable and individual litigation would be unduly burdensome to the courts. Further, individual litigation has the potential to result in inconsistent or contradictory judgments. A class action in this case presents fewer management problems and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.  The class, as defined herein, is ascertainable from the Defendants' records or from records which the Defendants have access and control.

## HISTORICAL BACKGROUND AND FACTUAL ALLEGATIONS

34.     In the late 1990s, Defendant HealthExtras, Inc. established marketing relationships with a number of the nation's largest VISA and MasterCard issuing banks, as well as Federal Express, in order to access their credit card and other customers for the purpose of marketing long term disability insurance coverage to persons in Georgia.

35.     HealthExtras, Inc. knew that any underwriter of such insurance would necessarily be required to comply with the insurance regulations of the various fifty (50) states.

36.     In 1999 or 2000, HealthExtras, Inc. caused marketing materials to be sent to Plaintiffs Randy and Mary Williams, and Larry and Linda Lake, via the United States mails.

37.     HealthExtras, Inc.'s marketing materials utilized the likeness of actor Christopher Reeve, famous for playing "Superman," to be the face of its marketing campaign.  The Williams Plaintiffs and the Lake Plaintiffs, like many Americans, were aware that Christopher Reeve had become paralyzed as a result of an equestrian accident.

38.     After expressing an interest in the HealthExtras program, Plaintiffs received a letter via the United States mails in approximately 2000 from Defendant

HealthExtras, signed by a Director of Client Services that included the following

statements:

> Enclosed please find the HealthExtras program description you
> requested.  Because lives change in an instant, like Christopher
> Reeve's, HealthExtras was created to provide families with financial
> security should the unthinkable happen.

> $1,000,000 cash payment if you are permanently disabled due to an
> accident.  And as a HealthExtras member, you have two tax-free
> options: a $1,000,000 lump sum cash payment or a $250,000 cash
> payment plus $5,000 per month for 20 years.

> $2,500 a year in reimbursements for coinsurance and deductibles for
> healthcare expenses when you are traveling.

39.     This mail solicitation was intended to induce the Plaintiffs to purchase

and retain the specified disability insurance, wherein Defendant HealthExtras, Inc.

specifically offered the Plaintiffs the opportunity to purchase disability insurance.

40.     This written solicitation was typical of the solicitations used in the

HealthExtras Scheme, which offered disability insurance to certain "targeted"

credit card customers.

41.     The Williams and the Lake Plaintiffs enrolled in the HealthExtras

"benefit program" and agreed to pay premiums which subsequently appeared as

charges/debits on their credit/debit card statements. Defendant HealthExtras, Inc.

accepted the respective named Plaintiffs' enrollment by letter from the Director,

Member Services, that advised the Plaintiffs that "you have armed yourself with

one of the most exciting and affordable disability plans found anywhere in America today."  Additionally, the acceptance letter included a photograph of Christopher Reeve and a message purportedly from him that stated "[b]ecause lives can change in an instant, as mine did, you should have the additional security for yourself and your family that HealthExtras can provide."

42.    These charges that initially appeared on Plaintiffs' credit card statements were shown as being from "C Reeve Disability Ins 800-554-6797 MD." This entry on Plaintiffs' credit card statements further confirmed to Plaintiffs that they were buying disability insurance coverage.

43.    Plaintiffs were charged premiums on a periodic basis, which depending on the period of time, was usually monthly or annually.  At various points in time, the HealthExtras Scheme offered a discount if purchasers paid the premium in a single annual lump sum payment, instead of on a monthly basis.

44.    In 2006, the entry on Plaintiffs' credit card statement changed to "Accident Protection Pl 800-554-6797 MD."

45.    During the course of the HealthExtras Scheme, premiums were increased at least twice without the approval of the Georgia Insurance Commissioner.

46.     Plaintiffs' credit cards were charged for the premiums on the purported disability insurance coverage.  Those invoices were reflected on statements received by Plaintiffs from their credit card issuers through the United States mails.

47.     Plaintiffs then paid those credit card statements by check, sent through the United States mails.  For example, most recently the Lakes received statements from Chase Visa through the United States mail, showing the following charges:

| *Date* | *Amount* | *Description* |
|--------|----------|---------------|
| 04/05/13 | $89.70 | Accident Protection Pl, MD |
| 09/12/13 | $89.70 | Accident Protection Pl, MD |
| 10/07/13 | $89.70 | Accident Protection Pl, MD |
| 01/03/14 | $89.70 | Accident Protection Pl 800-654-6797 MD |

48.     The Lakes paid these amounts in full by check, as part of their credit card statements.  Those payments were sent to Chase through the United States mail.

49.     The disability coverage sold by HealthExtras purported to have two primary benefits.  First, the Accidental Permanent and Total Disability insurance purports to provide "coverage" of a One Million Dollar ($1,000,000.00) benefit in the event of permanent disability as a result of an accident.  Second, an Emergency Accident and Sickness Medical Expense Benefit that is advertised and purported to

cover up to Two Thousand Five Hundred ($2,500.00) in medical expenses in the event of accident or sickness while away from home.

50.    On January 1, 2005, Defendant National Union became the underwriter for the One Million Dollar ($1,000,000.00) Accidental and Permanent Total Disability Benefit.

51.    The Plaintiffs' Two Thousand Five Hundred Dollar ($2,500.00) Emergency Accident and Sickness Medical Expense Benefit has been underwritten by Virginia Surety Company, Inc. from the date of their enrollment to present.

52.    The Williams Plaintiffs and the Lake Plaintiffs paid accidental disability premiums from 2000 through 2013 for the accidental disability coverage sold to them by the Catamaran Defendants.

53.    Neither the Williams Plaintiffs nor the Lake Plaintiffs have ever been provided with a copy of the operative policy.  No other member of the proposed class has ever been provided with a copy of the operative policy.

## THE HEALTHEXTRAS SCHEME IS FRAUDULENT

54.    The marketing materials for the HealthExtras Program represented that it provided affordable coverage for low probability, high consequence events, such as disability.  Neither in those materials nor anywhere else, however, did any Defendant ever disclose that nearly all of the purported premiums paid by the

victims went to marketing expenses and profits for HealthExtras or fees paid to the

banks that made their credit card customer information available to HealthExtras

for marketing purposes.

55.    For example, when monthly premiums for the One Million Dollar

HealthExtras disability benefit were $15.95 per month, only $2.24 of that amount

was paid to National Union, the purported underwriter of the disability policy.  In

other words, less than 15% of the premium paid by members for disability

coverage actually went to an insurance company.

56.    Persons who purchased purported disability insurance coverage under

the HealthExtras Scheme were consistently denied disability benefits even after

suffering catastrophic injuries which rendered them disabled under the description

of insurance coverage sent to those persons.  For example, a couple who purchased

disability insurance sold through the HealthExtras Scheme was denied coverage

after the husband was a victim of workplace violence that rendered him a

paraplegic after being shot in the spine.  Despite the fact that he was a paraplegic

and permanently and totally disabled, his disability claim was denied, and he was

forced to sue.  *Filyaw v. National Union Fire Insurance Company of Pittsburgh,*

*Pa., et al.*, Civil Action No. 4:10-cv-01628-JMC-SVH, United States District

Court for the District of South Carolina, Florence Division.

57.     Although the coverage description disclosed certain limitations on the policy, neither HealthExtras nor any other Defendant disclosed that only a small fraction of the purported premiums actually went to an insurance company, nor did they disclose there was no present intention to pay disability benefits that fell within the terms of coverage.  In other words, neither HealthExtras nor any other Defendant ever disclosed that the purported disability insurance coverage was illusory.

## THE PURPORTED HEALTHEXTRAS DISABILITY POLICY IS ILLEGAL UNDER GEORGIA LAW

58.     Defendants circumvented Georgia laws and regulations governing the issuance of group accident and sickness insurance in order to carry out the HealthExtras Scheme.

59.     A group accident and sickness policy differs from an individual policy in that a single master policy is issued to a group or association, as opposed to an individual person.  Thus, the group is the actual policyholder.  Each member of the group that is provided coverage under the master policy is issued a Certificate of Insurance that is required to summarize the coverage terms and explain the individual's rights under the master policy.

60.     Georgia Insurance Code O.C.G.A. § 33-30-1(a)(1)-(7) defines eligible group insurance as follows:

(a)     "Group accident and sickness insurance" is that form of accident and sickness insurance covering the groups of persons listed in paragraphs (1) through (7) of this subsection, with or without one or more members of their families or one or more of their dependents or covering one or more members of the families or one or more dependents of persons in such groups, and issued upon the following basis:

    (1)     Under a policy issued to an employer or trustees of a fund established by an employer, who shall be deemed the policyholder, insuring at least two employees of such employer for the benefit of persons other than the employer.  As used in this paragraph, the term "employees" includes the officers, managers, and employees of the employer; the individual proprietor or partners, if the employer is an individual proprietor or partnership; the officers, managers and employees of subsidiary or affiliated corporations; and the individual proprietors, partners, and employees of individuals and firms, if the business of the employer and such individual or firm is under common control through stock ownership, contract, or otherwise.  The term may include retired employees.  A policy issued to insure employees of a public body may provide that the term "employee" shall include elected or appointed officials;

    (2)     Under a policy issued to an association, including a labor union, which shall have a constitution and bylaws and which has been organized and is maintained in good faith for purposes other than that of obtaining insurance, insuring at least ten members, employees, or employees of members of the association for the benefit of persons other than the association or its officers or trustees.  As used

in this paragraph, the term "employees" may include retired employees:

(3)    Under a policy issued to the trustees of a fund established by two or more employers in the same industry, by one or more labor unions, by one or more employers and one or more labor unions, or by an association as defined in paragraph (2) of this subsection, which trustees shall be deemed the policyholder, to insure not less than ten employees of the employers of members of the union or of such association or of members of such association for the benefit of persons other than the employers or other unions or such associations.  As used in this paragraph, the term "employees" includes the officers, managers, and employees of the employer and the individual proprietor or partners, if the employer is an individual proprietor or partnership. The term may include retired employees.  The policy may provide that the term "employees" shall include the trustees or their employees, or both, if their duties are principally connected with such trusteeship;

(4)    Under a policy issued to any person or organization to which a policy of group life insurance may be delivered in this state, to insure any class or classes of individuals that could be insured under such group life policy;

(5)    Under a policy issued to a creditor, or to a trustee or agent appointed by two or more creditors, which creditor, trustee, or agent shall be deemed to the policyholder, to insure mortgagors of the creditor. The insurance must be written in connection with a credit transaction that is secured by a first mortgage or deed of trust; must be made to finance the purchase of real property or the construction of

a dwelling thereon, or to refinance a prior credit transaction made for such a purpose; and shall be payable to the policyholder.  Such payment shall reduce or extinguish the unpaid mortgage of the mortgagor or the extent of such payment;

(6)     Under a policy issued to cover any other substantially similar group which in the discretion of the Commissioner may be subject to the issuance of a group accident and sickness policy or contract; or

(7)(A)  Under a policy issued to a legal entity providing a multiple employer welfare arrangement, which means any employee benefit plan which is established or maintained for the purpose of offering or providing accident and sickness benefits to the employees of two or more employers, including self-employed individuals, individuals whose compensation is reported on Federal Internal Revenue Service Form 1099, and their spouses or dependents.  The term shall not apply to any plan or arrangement which is established or maintained by a tax-exempt rural electric cooperative or a collective bargaining agreement.

(B)   The amounts of insurance under the policy must be based upon some plan precluding individual selection either by the employees, employers, or trustee.

(b)     As used in this chapter, the term "true association" means an organization that:

(1)     Has been in existence for at least five years;

(2)   Has been formed and maintained in good faith for purposes other than obtaining insurance:

(3)   Does not condition membership in the association on any health status related factor relating to an individual (including an employee of an employer or a dependent of an employee);

(4)   Makes health insurance coverage offered through the association available to all members regardless of any health status related factor relating to such members (or individual eligible for coverage through a member);

(5)   Does not make health insurance coverage offered through the association available other than in connection with a member of the association; and,

(6)   Meets such additional requirements as may be imposed under Georgia law or regulation.

61.   The insurance coverage sold pursuant to the HealthExtras Scheme did not meet the requirements of O.C.G.A. § 33-30-1.  The policy was not issued to any entity or group authorized by subparts (1)-(7) of O.C.G.A. § 33-30-1(a).  Nor do holders of VISA, MasterCard and American Express credit cards constitute a "true organization" as defined by O.C.G.A. § 33-30-1(b).

62.   There was no organization of holders of VISA, MasterCard and American Express credit cards that had been in existence for at least five years when the HealthExtras program began, nor has any such organization existed during the time period relevant to this case.

1196703.1

26

63.    Blanket accident and sickness insurance, as defined by Georgia law, is a form of group accident and sickness insurance covering specific groups of persons issued on a specific basis.  The insurance coverage sold pursuant to the HealthExtras Scheme did not satisfy the requirements of O.C.G.A. § 33-30-3.

64.    The Georgia Insurance Code O.C.G.A. § 33-30-3 provides as follows:

"Blanket accident and sickness insurance" is that form of group accident and sickness insurance covering the groups of persons listed in paragraphs (1) through (6) of this Code section and issued upon the following basis:

(1)    Under a group policy or contract issued to any common carrier or to any operator, owner, or lessee of a means of transportation, who or which shall be deemed the policyholder, covering a group defined as all persons or all persons of a class who may become passengers on such common carrier or such means of transportation;

(2)    Under a group policy or contract issued to an employer, who shall be deemed the policyholder, covering all employees, dependents, or guests defined by reference to specified hazards incident to the activities or operations of the employer or any class of employees, dependents, or guests similarly defined;

(3)    Under a group policy or contract issued to a school or other institution of learning, a camp, the sponsor of the institution of learning or camp, or to the head or principal thereof, who or which shall be deemed the policyholder, covering students or campers; and supervisors and employees may be included;

(4)    Under a group policy or contract issued in the name of any religious, charitable, recreational, educational, or

civic organization, which shall be deemed the policyholder, covering participants in activities sponsored by the organization;

(5)   Under a group policy or contract issued to a sports team or sponsors thereof, which shall be deemed the policyholder, covering members, officials, and supervisors; or,

(6)   Under a group policy or contract issued to cover any other risk or class of risks which in the discretion of the Commissioner may be properly eligible for blanket accident and sickness insurance. The discretion of the Commissioner may be exercised on an individual risk basis or class of risks, or both.

65.   Under the HealthExtras Scheme, instead of the policy being issued to a group authorized by O.C.G.A. §§ 33-30-1 or 33-30-3, the policy was issued to a purported trust, most recently "AIG Group Insurance Trust, for the Account of HealthExtras." These trusts, including the AIG Group Insurance Trust, were sham organizations that were formed by the Defendants and functioned as their alter egos. These sham organizations had no constitution or bylaws and the HealthExtras "members" had no voting privileges, representation, participation or involvement in these purported trusts, which were created to facilitate the HealthExtras Scheme by avoiding regulatory supervision and oversight.

66.   Although Georgia law prohibited any blanket policy from being issued or delivered in this state unless a copy of the form of the blanket policy has

been filed with and approved by the Commissioner of Insurance, no such filing or approval occurred with regard to any policy at issue in this case.  The Georgia Department of Insurance has not approved the policy for issuance or delivery to any eligible blanket groups in Georgia.

67.   The HealthExtras disability policy issued by Defendants was not issued in compliance with O.C.G.A. § 33-30-1(a)(1)-(7) or any other section of the Georgia Insurance Code.  "AIG Group Insurance Trust, for the Account of HealthExtras" is not a group that was or is eligible to purchase group accident and sickness insurance or blanket accident and sickness insurance pursuant to applicable Georgia law.

68.   The purported group to whom disability insurance was sold pursuant to the HealthExtras Scheme consists of persons whose only commonality is that they have a credit card and were chosen by HealthExtras and others as good marketing prospects.  The group of which the Williams Plaintiffs and the Lake Plaintiffs and other Class Members are a part of was formed by HealthExtras and the other Defendants solely to facilitate the HealthExtras Scheme.

69.   The Catamaran Defendants and National Union formed a sham group in order to circumvent regulatory supervision and scrutiny.  Because there was no legitimate group, there was no one to look out for the interests of the persons

paying for the purported disability coverage.  More specifically, there was no legitimate entity or organization to scrutinize the scope of the coverage and whether it was reasonable for the amount paid, determine where the money paid for the purported disability coverage was going, (i.e., whether it was being used to purchase insurance coverage or simply fuel for a marketing scheme), or monitor whether covered disability claims were actually being paid.

70.    Because there was no legitimate group or organization involved, there was no mechanism or structure for purchasers of disability coverage to communicate with one another concerning cost, coverage, or payment of claims.

71.    After diligent inquiry, Plaintiffs have been unable to find evidence that National Union ever submitted an application for group or blanket accident insurance coverage in Georgia.  Plaintiffs have been able to confirm which applications were filed in some other states, but those applications merely serve to confirm the fraudulent nature of the HealthExtras Scheme.  For example, under some of those applications, the policy holder is sometimes shown as AIG Group Insurance Trust, but at other times as "HealthExtras."  HealthExtras is shown as the participating organization, i.e., the group, but the eligible persons are described as "all customers of participating organization or policy holder."

72.    "Customers" of HealthExtras do not constitute a group recognized under O.C.G.A. § 33-30-1(a)(1)-(7) or O.C.G.A. § 33-30-3.

73.    HealthExtras also marketed disability insurance coverage in states where, as with Georgia, no application was ever filed or approved.

74.    The HealthExtras Scheme succeeded.  It derived credibility from a spokesperson who was a well-liked and respected actor who had suffered a tragic accident.  That credibility was ultimately further enhanced by the participation of National Union.  The HealthExtras Scheme targeted a large pool of potential customers who, although purportedly members of a group, in fact had no legitimate organization or entity protecting their interests and no mechanism for learning, short of becoming disabled themselves and being denied coverage, that purported insurance coverage they were being sold was illusory and worthless.

75.    Victims of the HealthExtras Scheme had no access to the policy, did not know that only a tiny fraction of the money they were paying for coverage ever went to an insurance company, did not know the policy holder was a sham organization and the alter-ego and instrumentality of the perpetrators of the scheme, and did not know that the purported disability insurance coverage they were purchasing was illegal, illusory and worthless.

76.     Plaintiffs and others similarly situated would have had a confidential

relationship of trust and confidence with a legitimate group.  By creating a sham

group to facilitate the HealthExtras Scheme, Defendants assumed the obligations

of that confidential relationship.

## A SCHEME OF FALSE AND DECEPTIVE ADVERTISING

77.     The HealthExtras Scheme targeted the Plaintiffs and other Georgia

residents with direct mail advertisements that included, but were not limited to the

following misleading statements:

     a.    "This program provides valuable protection in the event you become permanently totally disabled due to an accident."

     b.    "This HealthExtras Benefit Program provides you with a $1,000,000 tax-free cash payment if you're permanently disabled due to an accident."

     c.    "If an accident leaves you - the primary member - permanently disabled, you will receive a lump sum payment of $1,000,000."

     d.    "After 12 months of continuing and permanent disability caused by an accident - including the inability to work - the primary member will receive a payment of $1,000,000."

     e.    "You're covered with a $1,000,000 tax-free cash payment if you are permanently disabled as a result of an accident."

78.     These direct mail advertisements did not disclose that the program was illegal, fraudulent and illusory, or that there was no present intent to pay disability claims under the policy for which the class members were paying.

### A SCHEME OF ILLEGAL UNDERWRITING OF THE HEALTHEXTRAS DISABILITY POLICY

79.     Neither the Catamaran Defendants nor HealthExtras, LLC is a licensed insurance Company anywhere.

80.     The Catamaran Defendants participated in developing the policy language and determined the amount of premiums charged.

81.     The purported Underwriter, National Union, accepted nominal payments to lend credibility to the HealthExtras Scheme, but did not possess any present intention to pay claims.

82.     Defendant National Union has an extensive history of violating insurance laws and regulations applicable to the sale of blanket insurance.

83.     On or about January 7, 2011, Defendant National Union entered into an Interim Consent Order with the Ohio Department of Insurance during the course of an examination of National Union's Accident and Health Division for the period January 1, 2008 through June 30, 2010.  The January 7, 2011 Interim Consent Order concerned the market of blanket accident/sickness policies to individuals who were customers of certain banking institutions.

84.     On February 14, 2012, Defendant National Union entered into another Interim Consent Order concerning the marketing and sale of non-employer group policies for which premium rates and the classification of risks pertaining thereto had not been approved.

85.     In September 2012, Chartis, Inc., the parent company of Defendant National Union, entered into a Multi-State Examination Regulatory Settlement Agreement on behalf of itself and certain of its insurance company subsidiaries, including Defendant National Union, which superseded the Interim Consent Orders dated January 7, 2011 and February 14, 2012.  Pursuant to the Multi-State Examination Regulatory Settlement Agreement, Chartis, Inc. agreed to pay, on behalf of itself and certain of its insurance company subsidiaries, including Defendant National Union, a minimum of $39 million and a maximum of $51 million in Administrative Penalties.

86.     Among the subject matters of the Multi-State Examination Regulatory Settlement Agreement were policy issuance to groups and associations and the use of trusts.

## FIRST CAUSE OF ACTION

### Unjust Enrichment

87.     Plaintiffs reallege and incorporate by reference each of the factual allegations set forth in Paragraphs 1-86 as if set forth herein.

88.     Defendants have been and continue to be enriched by their acts and omissions alleged herein.

89.     These deceptive acts and omissions allow Defendants to obtain millions of dollars from Georgia residents that would not have been gained but for Defendants' acts and omissions.

90.     Plaintiffs and the proposed Class members and those similarly situated paid Defendants an amount that far exceeds the value of the insurance product identified herein as a result of Defendants' acts and omissions.

91.     Plaintiffs and the Class members suffered damages due to the Defendants' acts and omissions as alleged herein.

92.     Defendants have and continue to be unjustly enriched as a result of their deceptive acts and omissions.

93.     Defendants lack any legal justification for engaging in a course of deceptive acts and omissions as alleged herein at Plaintiffs' and the Class' expense.

94.     No other remedy at law can adequately compensate Plaintiffs and the Class members for the damages occasioned by Defendants' conscious and willful choice to engage in a course of deceptive acts and omissions.

95.     When seeking to purchase accidental disability insurance and emergency accident and sickness insurance, Plaintiffs, and the putative Class Members have a choice of various underwriters, coverage amounts and coverage terms.

96.     Plaintiffs, and similarly situated Georgia residents purchased coverage due to its relatively low price point, its high coverage amount and other market based factors, including the marketing and likeness of HealthExtras Spokesperson, Christopher Reeve.

97.     Plaintiffs and the putative Class Members purchased their HealthExtras disability insurance in order to protect themselves should they suffer disability as a result of an accidental injury or accident or sickness while traveling. However, the actual HealthExtras policy is virtually worthless.

98.     Defendants, individually and collectively, failed to disclose that the insurance coverage being sold to Plaintiffs and the putative Class Members was illegal under Georgia law in that Plaintiffs and the putative Class Members were not members of a lawful "blanket group."

99.     By purchasing the HealthExtras program that included the component policies and paying fees and premiums, Plaintiffs and the putative Class Members conferred a benefit upon the Defendants, without knowledge that the purchased coverage was illegal and void.

100.    Defendants knowingly accepted and retained this non-gratuitous benefit conferred upon them by Plaintiffs and the putative Class Members despite Defendants' knowledge the subject policies were illegal as a matter of Georgia law for the reasons enumerated herein.

101.    Plaintiffs and the putative Class Members have spent and continue to spend thousands of dollars in premium payments for illegal policies that could never be lawfully sold to Georgia residents.

102.    The Defendants have been unjustly enriched in retaining the payments paid by Plaintiffs and the putative Class Members for the Accidental Permanent and Total Disability coverage and the Emergency Accident and Sickness Benefit insurance coverage.

103.    The Defendants' retention of the non-gratuitous benefit conferred by Plaintiffs and the putative Class Members under these circumstances is unjust and inequitable.

104.    No other remedy at law can adequately compensate Plaintiffs and the

putative Class Members for the economic damages resulting from Defendants'

wrongful actions as alleged herein.

105.    Because Defendants' retention of the non-gratuitous benefit conferred

upon them by Plaintiffs and the putative Class Members is unjust and inequitable,

Defendants must pay restitution in the form of disgorgement of all revenues,

earnings, profits, compensation and benefits which Georgia residents have paid to

the conspirators as a result of such business acts and practices.

## SECOND CAUSE OF ACTION

### Breach of the Duty of Good Faith and Fair Dealing

106.    Plaintiffs reallege and incorporate by reference each of the factual

allegations set forth in Paragraphs 1-86 as if set forth herein.

107.    Defendants have breached the duty of good faith and fair dealing to

Plaintiffs, and similarly situated Georgia residents, by engaging in the conduct set

forth hereinabove.

108.    Defendants, individually and collectively, knew that the HealthExtras

disability policy could only be issued to legal "blanket groups", that the

HealthExtras disability policies were sold to individuals who were not members of

a lawful "blanket group" under Georgia law, instead using the guise of insurance trusts in place of a lawful blanket group.

109.   Despite Defendants' collective knowledge, Defendants failed to reveal to Plaintiffs, and other similarly situated Georgia residents, that their HealthExtras disability policies were illegal and of little value; that their premiums were thus illegal and not approved; that they paid for illegal policies; and that they were not part of any lawful blanket group.

110.   Despite this duty, Defendants sold illegal HealthExtras insurance policies, collected premiums therefore and shared the monies derived there from Plaintiffs, and other similarly situated Georgia residents and thus breached the duty of good faith and fair dealing as a matter of law. This breach proximately caused damages to Plaintiffs, and other similarly situated Georgia residents.

111.   Plaintiffs, and other similarly situated Georgia residents, have been proximately injured as a result of the Defendants' breach of the duty of good faith and fair dealing and are thus entitled to damages proximately caused them by said breach.

## THIRD CAUSE OF ACTION

### Violation of O.C.G.A. § 16-14-4(a) (GA RICO)
### By All Plaintiffs Against The Catamaran Defendants and HealthExtras, LLC

112.   Plaintiffs reallege and incorporate by reference each of the allegations set forth in Paragraphs 1-86 as if set forth herein.

113.   Plaintiffs are "persons" within the meaning of O.C.G.A. § 16-14-6(c).

114.   The predicate acts engaged in by Defendants that form the pattern of racketeering activity include theft by taking, theft by deception, mail fraud and wire fraud.

### Theft By Taking

115.   On more than two occasions, the Catamaran Defendants and HealthExtras, LLC, individually and as parties to a crime, committed, attempted to commit, solicited another to commit, or engaged in acts involving theft by taking of property belonging to Plaintiffs and members of the class.

116.   The Catamaran Defendants and HealthExtras, LLC repeatedly used false and misleading marketing materials, descriptions of coverage, and other representations of fact to induce the Plaintiffs and members of the class to purchase fraudulent, illusory and worthless insurance coverage and to continue to pay for such coverage on a regular basis, often for many years.

117.   The Plaintiffs' money constitutes property within the meaning of O.C.G.A. § 16-1-3(13).  The Catamaran Defendants and HealthExtras, LLC unlawfully took the money of Plaintiffs and the members of the class with the intention of depriving them of that money.

118.   This conduct constitutes racketeering activity pursuant to O.C.G.A. §§ 16-14-3(9)(A)(ix) and 16-14-3(9)(B).

## Theft By Deception

119.   On more than two occasions, the Catamaran Defendants and HealthExtras, LLC, individually and as parties to a crime, committed, attempted to commit, solicited another to commit, or engaged in acts involving theft by deception, by obtaining property by deceitful means and artful practices, with the intention of depriving the Plaintiffs and other members of the class of their property.

120.   The Catamaran Defendants and HealthExtras, LLC committed theft by deception by creating or confirming Plaintiffs' impression of existing facts or past events which were false and which those Defendants knew to be false, and failing to correct false impressions of existing facts or past events which they had previously created or confirmed.

121.   The Catamaran Defendants and HealthExtras, LLC made these representations, creating and/or confirming the impressions of existing facts or past events which they had previously created or confirmed, even though the Catamaran Defendants knew or believed at the time of the representations that such statements were false and incorrect.

122.   The Catamaran Defendants and HealthExtras, LLC made these representations, creating and confirming these impressions, in order to induce Plaintiffs and other similarly situated individuals to purchase fraudulent, illusory, and worthless insurance coverage, so that Defendants could obtain money from Plaintiffs and other victims.

123.   The Catamaran Defendants and HealthExtras, LLC continued making fraudulent representations and/or confirming false impressions that they had previously created in order to induce Plaintiffs and other similarly situated individuals to continue to pay for fraudulent, illusory and worthless insurance coverage.

124.   Despite having numerous opportunities to do so, the Catamaran Defendants and HealthExtras, LLC failed to correct the false impressions described above that they had previously created or confirmed.  Instead, they affirmatively concealed their wrongful actions from their victims.

125.   The Catamaran Defendants and HealthExtras, LLC also prevented the Plaintiffs from acquiring information pertinent to the disposition of their funds, including information that would have contradicted the false representations of fact in the marketing materials.

126.   This conduct constitutes racketeering activity pursuant to O.C.G.A. §§ 16-14-3(9)(A)(ix) and 16-14-3(9)(B).

## **Mail Fraud**

127.   The Catamaran Defendants and HealthExtras, LLC engaged in multiple acts of mail fraud in violation of 18 U.S.C. 1341, by depositing or causing to be deposited, to be sent or delivered by the Postal Service, or any private or commercial interstate carrier, matters and things for the purpose of executing the HealthExtras Scheme.  This included:

A. Mailing or causing the mailing of fraudulent and misleading marketing materials relating to the solicitation of fraudulent, illusory, and worthless disability insurance;

B. Mailing or causing the mailing of fraudulent and misleading information relating to the sale of fraudulent, illusory, and worthless insurance;

C. Mailing or causing the mailing of fraudulent and misleading information relating to the illegal post-sale marketing of fraudulent, illusory, and worthless disability insurance;

D. Mailing or causing the mailing of fraudulent and misleading information relating to the illegal creation of "trusts" in which to "place" this insurance to attempt to avoid state insurance regulations and laws;

E. Mailing or causing the mailing of information relating to the illegal calculation and collection of excessive premiums or "fees" charged for this fraudulent, illusory, and worthless insurance product.

F. Causing the mailing of credit card invoices containing charges for fraudulent, illusory, and worthless insurance.

G. Causing the mailing of payments for credit card invoices containing charges for fraudulent and worthless insurance.

128. Defendants' violations of 18 U.S.C. § 1341 constitute racketeering activity pursuant to O.C.G.A. §§ 16-14-3(9)(A)(xxix) and 16-14-3(9)(B).

## **Wire Fraud**

129. The Catamaran Defendants engaged in multiple acts of wire fraud in violation of 18 U.S.C. 1343, by transmitting and causing to be transmitted by

means of wire communication in interstate commerce, writings, signs, signals, pictures, or sounds for the purpose of executing the HealthExtras Scheme.  This included:

A. Maintaining a website, www.healthextras.com, that transmitted misrepresentations in interstate commerce via electronic communications.  These included representations that HealthExtras provided "a cost-effective supplemental lifetime accidental disability insurance program that provides families with additional financial security should the unthinkable happen," and other similar misrepresentations.  The website included a picture and embedded video conversation with actor Christopher Reeve.

B. Causing Plaintiffs' credit or debit card accounts to be charged or debited for premiums for fraudulent, illusory and worthless disability insurance, which transactions took place via electronic means in interstate commerce;

C. Causing Plaintiffs' checking account to be charged or debited for premiums for fraudulent, illusory and worthless disability insurance, which transactions took place via electronic means in interstate commerce;

D. Causing Plaintiffs' bank accounts to be charged or debited for premiums for fraudulent, illusory and worthless disability insurance, which transactions took place via electronic means in interstate commerce.

This conduct constitutes racketeering activity pursuant to O.C.G.A. §§ 16-14-3(9)(A)(xxix) and 16-14-3(9)(B).

**The Acts of Racketeering Activity Are Related and Form a Pattern**

130.   The acts of racketeering activity committed by the Catamaran Defendants and HealthExtras, LLC had, among other things, the same or similar intents, results, victims, and methods of commission.

131.   The acts of racketeering activity involve the sale of fraudulent, illusory, and worthless disability insurance coverage.

132.   The acts of racketeering activity had the same or similar intents, in that they sought to obtain money through racketeering activity.

133.   The acts of racketeering activity had the same or similar results, in that the Defendants actually obtained money through racketeering activity.

134.   The acts of racketeering activity committed by the Catamaran Defendants had the same or similar victims: individual holders of credit cards who

were deceptively induced to purchase fraudulent, illusory, and worthless disability insurance.

135.   The methods by which the incidents of racketeering activity were committed were the same or similar, including by way of example and not limitation, the use of false marketing materials, the creation of a sham group to which an insurance policy was supposedly sold, the creation of a sham trust, the deliberate evasion of applicable insurance laws and regulations, charging purported premiums of which only a small fraction were paid to an actual insurance company, charging purported premiums for insurance coverage that was illegal, fraudulent and illusory, and denying claims covered by the terms of the purported policy.

136.   The acts of racketeering activity are interrelated by distinguishing characteristics and are not isolated incidents.  The acts involve the same or similar methods of commission, the same or similar benefits to the perpetrators, the same or similar injuries to the Plaintiffs, and the same or similar efforts to conceal the perpetrators' misconduct.

137.   The acts of racketeering activity caused injury to the Williams Plaintiffs, the Lake Plaintiffs, and the Class Members.

138.   The Catamaran Defendants and HealthExtras, LLC violated O.C.G.A. § 16-14-4(a) by obtaining, directly or indirectly, personal property consisting of money, through a pattern of racketeering activity.

139.   Defendants are guilty of frauds by which the Plaintiffs have been debarred or deterred from bringing an action, within the meaning of O.C.G.A. § 9-3-96.

140.   The conduct in violation of O.C.G.A. § 16-14-4(a) continued within five years of the filing of this action and in fact continues to the present day.

141.   In committing the fraud and other misconduct alleged above, the Defendants have demonstrated willful misconduct, fraud, wantonness, or that entire want of care that gives rise to a presumption of conscious indifference to consequences to rendering them liable for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

142.   Because the Defendants acted with specific intent to cause harm to those persons, there is no limit to the amount of punitive damages for which the Defendants may be liable.

143.   Defendants continue to market, sell, broker, underwrite, collect, allocate and share premiums for the illegal HealthExtras disability policies through

the pendency of this action despite the clear and continuing violations of the Georgia law and public policy.

144.   Plaintiffs are aggrieved persons within the meaning of O.C.G.A. § 16-14-6(b).  As a result, Plaintiffs are entitled to appropriate preliminary and permanent injunctive relief, and to appropriate orders and judgment requiring Defendants to cease their legal conduct imposing reasonable restrictions upon Defendants' future activities sufficient to prohibit and prevent future violations of the law.

145.   Pursuant to O.C.G.A. § 16-14-6(c), Plaintiffs and the rest of the Class Members are entitled to an award of treble damages, that being three (3) times their actual damages, punitive damages, and their costs for investigation and litigation, including reasonable attorney's fees.

## FOURTH CAUSE OF ACTION

**Violation of O.C.G.A. § 16-14-4(c)(GA RICO)
by all Plaintiffs Against all Defendants**

146.   The Plaintiffs reallege and incorporate by reference each of the allegations set forth in Paragraphs 1-88 as if set forth herein.

147.   The Defendants also violated O.C.G.A. § 16-14-4(c) by conspiring to violate O.C.G.A. § 16-14-4(a).  In furtherance of that conspiracy, the Defendants

committed overt acts that include but are not limited to the racketeering activity alleged above and in Paragraphs 112-145 below.

148.   Defendants entered into a corrupt agreement, obtained money from Plaintiffs and other members of the Class in a pattern of racketeering activity, in violation of Georgia RICO.

149.   Pursuant to this corrupt agreement, Catamaran Defendants and HealthExtras, LLC engaged in the acts of racketeering activity alleged above in Paragraphs 112-145.

150.   As part of the conspiracy, Defendant National Union purported to issue group or blanket insurance coverage which had never been approved by Georgia Commissioner of Insurance for sale, issuance or delivery to Georgia residents.  As a further part of the conspiracy, National Union allowed its name to be used as part of the HealthExtras scheme, in order to lend credibility to that scheme and derive revenues therefrom.

151.   National Union accepted proceeds derived from the scheme, in the form of purported insurance premiums, knowing that insurance coverage offered under the HealthExtras scheme was legal, fraudulent, and illusory.

152.   Each of the Defendants agreed upon an overall objective, which was to obtain money from Plaintiffs and other Class Members through a pattern of

racketeering activity involving the marketing and sale of illegal, fraudulent and illusory disability insurance coverage.

153.   The exact date upon which the conspiracy commenced is presently unknown to Plaintiffs, but began with the first sale of purported disability insurance coverage under the HealthExtras Scheme, during approximately 2001.

154.   Defendant HealthExtras, Inc., which subsequently changed its name to Catalyst Health Solutions, Inc., and later became part of Catamaran Health Solutions, LLC, participated in the conspiracy continuously since its formation and commencement.

155.   Defendant National Union joined in the conspiracy in 2005, when it became the underwriter for the purported disability coverage.  National Union continues to participate in the conspiracy to the present day.

156.   Defendant HealthExtras, LLC has participated in the conspiracy continuously since its formation in 2012.

157.   The Defendants also violated O.C.G.A. § 16-14-4(c) by endeavoring to violate O.C.G.A. § 16-14-4(a).

158.   As a direct and proximate result of these violations of O.C.G.A. § 16-14-4(c) by the Defendants in the scheme, the Williams Plaintiffs, the Lake Plaintiffs,  and the other Members of the putative Class, have suffered damages

and injury for which Defendants are jointly and severally liable in such amounts as may be determined at trial.

159.   The conduct in violation of O.C.G.A. § 16-14-4(c) continued within five years of the filing of this action and in fact continues to the present day.

160.   Defendants are guilty of frauds by which the Plaintiffs have been debarred or deterred from bringing an action, within the meaning of O.C.G.A. § 9-3-96.

161.   In committing the fraud and other misconduct alleged above, the Defendants have demonstrated willful misconduct, fraud, wantonness, or that entire want of care that gives rise to a presumption of conscious indifference to consequences to rendering them liable for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

162.   Because the Defendants acted with specific intent to cause harm to those persons, there is no limit to the amount of punitive damages for which the Defendants may be liable.

163.   Defendants continue to market, sell, broker, underwrite, collect, allocate and share premiums for the illegal HealthExtras disability policies through the pendency of this action despite the clear and continuing violations of the Georgia law and public policy.

164.   Plaintiffs are aggrieved persons within the meaning of O.C.G.A. § 16-14-6(b).  As a result, Plaintiffs are entitled to appropriate preliminary and permanent injunctive relief, and to appropriate orders and judgment requiring Defendants to cease their legal conduct imposing reasonable restrictions upon Defendants' future activities sufficient to prohibit and prevent future violations of the law.

165.   Pursuant to O.C.G.A. § 16-14-6(c), Plaintiffs and the rest of the Class Members are entitled to an award of treble damages, that being three (3) times their actual damages, punitive damages, and their costs for investigation and litigation, including reasonable attorney's fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all Class Members, demand judgment against Defendants as follows:

(a)   An order certifying the proposed Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as Class Representatives and their attorneys as Class Counsel to represent the Class Members;

(b)   An order declaring the HealthExtras disability policy illegal under Georgia law and against public policy;

(c)     An order declaring that the Defendants' conduct to be in violation of

        Georgia RICO;

(d)     An order entering judgment in favor of Plaintiffs, Randy and Mary

        Williams, and the Class Members against Defendants;

(e)     An order awarding damages in the form of actual damages, treble

        damages, and punitive damages against Defendants in favor of

        Plaintiffs and putative Class Members in an amount to be determined

        by the Court as fair and just given Defendants' wrongful conduct;

(f)     Injunctive relief in the form of an Order prohibiting further of the

        Defendants' unlawful activities in the State of Georgia or an order of

        such other non-monetary relief as may be necessary and proper; and

(g)     An order awarding Plaintiffs and the Class their reasonable attorneys'

        fees, expenses and costs, including costs of investigation reasonably

        incurred.

## **DEMAND FOR JURY TRIAL**

Plaintiffs and the Class Members hereby demand a jury trial on all claims so

triable in this action.

Respectfully submitted this 9th day of May, 2014.

RANDY AND MARY WILLIAMS,

By Counsel,

/s/ J. Benjamin Finley
J. Benjamin Finley
GA State Bar NO. 261504
MaryBeth V. Gibson
GA State Bar NO. 785643
THE FINLEY FIRM, P.C.
2931 N. Druid Hills Road, NE, Suite A
Atlanta, GA 30329
Telephone: (404) 320-9979
Fax: (404) 320-9978
bfinley@thefinleyfirm.com
mgibson@thefinleyfirm.com

/s/ Aaron C. Hemmings
Aaron C. Hemmings
NC State Bar No. 29810
(pro hac vice to be filed)
HEMMINGS & STEVENS, P.L.L.C.
5613 Duraleigh Road, Suite 111
PO Box 90698
Raleigh, NC 27675
Telephone: (919) 277-0161
Fax: (919 277-0162
ahemmings@hemmingsandstevens.com

/s/ Joseph H. Aughtman
Joseph "Jay" H. Aughtman
AL State Bar No. ASB-8081-A43J
(pro hac vice to be filed)
AUGHTMAN LAW FIRM, LLC
1772 Platt Place
Montgomery, AL 36117
Telephone: (334) 215-9873
Facsimile: (334) 213-5663
jay@aughtmanlaw.com

**Attorneys for Plaintiffs**

## **RULE 7.1D CERTIFICATE OF TYPE, FORMAT AND FONT SIZE**

Pursuant to Local Rule 7.1D of the United States District Court of the

Northern District of Georgia, the undersigned certifies that the foregoing

submission to the Court was computer-processed, double-spaced between lines,

and used Times New Roman font of 14 point size.

*s/ J. Benjamin Finley*
J. Benjamin Finley

1196703.1