# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| RANDY AND MARY WILLIAMS and LARRY AND LINDA LAKE, ) ) ) ) Plaintiffs, ) ) v. ) ) ) NATIONAL UNION FIRE INSURANCE ) COMPANY OF PITTSBURGH, PA, ) HEALTHEXTRAS, INC., ) HEALTHEXTRAS, LLC, ) CATAMARAN HEALTH ) SOLUTIONS, LLC, ) ) Defendants. ) ) | CIVIL ACTION NO. 1:14-CV-00309-TWT |

**DEFENDANT NATIONAL UNION'S REPLY IN SUPPORT OF ITS
<u>MOTION FOR SUMMARY JUDGMENT</u>**

## INTRODUCTION

Plaintiffs originally alleged that National Union's Coverage[1] was void and illusory because it failed to comply with Georgia law. This Court rejected that argument, as have six other courts. Plaintiffs pivoted and now argue that the Coverage was illusory because National Union never intended to pay benefits. Although they attempt to hide behind lengthy arguments and case citation, without this essential predicate, plaintiffs have no injury, no standing, and no claims.

National Union is entitled to summary judgment because nothing can change the fact that it paid over $8.2 million in claims, which consists of appoximately $7 million in PTD benefits and $1.2 million in AD&D benefits. Plaintiffs insist that alleged statutory violations create Article III standing, but this merely assumes their desired conclusion – that the Coverage was illusory. Plaintiffs also disregard millions in benefits, but no court has deemed coverage illusory because an insurer disputed a handful of claims. Otherwise, any denial could render coverage illusory, requiring courts to second-guess every decision even when plans cover thousands of lives over decades.

On this record, the Coverage could not have been illusory when offered in 2005. The Court thus should grant this motion and dispose of this action.

---

[1] Capitalized terms have the same meanings as in National Union's opening brief.

# ARGUMENT[2]

## I. PLAINTIFFS CANNOT ESTABLISH ACTIONABLE PREDICATE ACTS, INJURY, OR STANDING.

Plaintiffs spill much ink describing the predicate acts upon which their Georgia RICO claims are based – alleged theft by deception and taking, and mail and wire fraud. (Dkt. 206 at 7-14). The alleged conduct underlying each predicate act of fraud or theft, and each purported injury, is one and the same: selling "illusory" Coverage with no intent to pay covered claims. (*Id.* at 9, 14). For the reasons articulated below, the Coverage was not illusory. Thus, each of plaintiffs' alleged predicate acts fail and plaintiffs cannot prove a cognizable injury.

### A. The Undisputed Record Of Paid Claims Establishes That The Coverage Was Not Illusory Under Plaintiffs' New Theory.

Under Georgia law, "an 'illusory promise' exists when 'words of promise' . . . by their terms make performance entirely optional with the 'promisor' whatever may happen, or whatever course of conduct in other respects he may pursue." *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1374 (11th Cir. 2005) (applying Georgia law). At the outset of this case, this Court held that the Coverage underwritten by National Union was "valid and enforceable." (Dkt. 98 at 5-7). Every court presented with the same question in copy-cat suits has

---

[2] National Union also incorporates the arguments in Catamaran's contemporaneously-filed reply.

agreed.[3]  As a result, insureds always have had the ability to demand payment for covered claims, precluding a finding that the Coverage was illusory.

Plaintiffs, however, asked this Court for an opportunity to try to prove that, from the very outset, National Union never intended to pay claims.  The Court permitted the case to proceed to determine if National Union underwrote essentially fictitious insurance.  To actually prove such a theory, plaintiffs needed to do more than allege or prove that National Union failed to pay certain claims.  A breach of contract cannot prove intent to commit fraud; otherwise, every breach would give rise to fraud claims.  *See, e.g.*, *Gibson Tech. Servs., Inc. v. JPay, Inc.*, 327 Ga. App. 82, 84-85 (2014) ("Actionable fraud . . . does not result from a mere failure to perform promises made.") (quotation omitted); *Williams v. Unum Life Ins. Co. of Am.*, No. 1:07-cv-0240, 2007 WL 2479561, at *2 (N.D. Ga. Aug. 27, 2007) (holding coverage denial not sufficient to prove fraud).

The undisputed record establishes that National Union paid millions in claims.  National Union paid over $8.2 million in benefits to over 200 policyholders, almost all of which was paid without arbitration or litigation.  (SOF ¶¶ 32-34).  Indeed, plaintiffs' own evidence underscores that National Union lost

---

[3] (Dkt. 175-1 at 19 (collecting cases)).  Since the opening brief, two additional courts have concurred.  *Giercyk*, 2015 WL 7871165, at *5 (D.N.J. Dec. 4, 2015); *Campbell*, 2015 WL 5449791, at *9 (D.D.C. Sept. 16, 2015).

money on the program in several years ***precisely because*** it was paying claims and predicted (accurately) that it would pay more claims in the future. (Pls' Ex. 8).

The undisputed history of substantial payments – often in excess of premiums – dooms plaintiffs' counter-factual and baseless theory that National Union began offering illusory coverage in 2005. *See, e.g.*, *Wyse v. Potamkin Chrysler-Plymouth, Inc.*, 189 Ga. App. 64, 65 (1988) (affirming summary judgment because evidence that defendant performed several repairs "conclusively negated the allegation" that it "never intended to make good" on a promise to perform repairs); *Equifax, Inc. v. 1600 Peachtree, LLC*, 268 Ga. App. 186, 195 (2004) (granting summary judgment on claim that defendant had no intent to perform when entering lease where evidence showed defendant made lease payments prior to alleged breach).

Because the Coverage was enforceable and non-illusory, the predicates underlying plaintiffs' claims and alleged injuries – which all assume National Union sold fake insurance – necessarily fail. Thus, the Court should grant summary judgment for National Union because plaintiffs cannot prove an actionable or cognizable injury.

**B. Because National Union Paid Claims, Plaintiffs' Claims And Alleged Injuries Rest On Speculation.**

Plaintiffs admit that they did not experience a covered injury. (SOF ¶¶ 48,

4

49, 63; Dkt. 98 at 7). In fact, they explicitly carved all individuals who did so out of the putative class. (Dkt. 77 ¶ 28(e)). Because National Union paid numerous claims, plaintiffs can only speculate that if they had experienced a covered loss and submitted valid claims, their claims would have been one of those that was denied.

This is precisely the type of argument that courts across the country have repeatedly held cannot support a claim for relief and does not rise to the level of an injury that can support Article III standing. (Dkt. 175-1 at 13-17 (collecting cases)). For example, in *Weaver v. Aetna Life Ins. Co.*, an insured who never incurred a covered loss and never submitted a claim asserted a RICO claim based on an argument that if she had incurred a claim, it would have been denied because her insurance policy was allegedly "nonexistent or illegal." No. 3:08-CV-00037, 2008 WL 4833035, at *2-3 (D. Nev. Nov. 4, 2008). The Court rejected this argument, explaining that "one could not deem a policy nonexistent unless she were improperly denied benefits." *Id.* at *2-3. The Ninth Circuit affirmed. *Weaver v. Aetna Life Ins. Co.*, 370 F. App'x 822, 823 (9th Cir. 2010) (holding because the plaintiff "did not allege that she made a claim for which payment was not received during the time that she paid premiums . . . [she] has shown no injury-in-fact to support standing" and noting that this is particularly true where, as here, "benefits were paid to insureds who made claims").

5

As in *Weaver*, plaintiffs – who did not file a benefits claim – cannot pursue "what if" theories based on hypothetical injuries. Thus, their claims fail as a matter of law.

### C. Plaintiffs' "Evidence" Cannot Create A Triable Dispute That The Coverage Was Illusory Under Their New Theory.

Despite millions paid to hundreds of insureds, plaintiffs contend a material dispute exists about National Union's "intent" to pay claims because four claims proceeded to litigation or arbitration (three were settled and one remains in litigation). Plaintiffs' position make no sense, legally or factually. Cognizant that National Union paid over $8.2 million in benefits, plaintiffs are left with misleading arguments and irrelevant "evidence."

#### 1. National Union's Handling of Four Claims is Irrelevant.

Plaintiffs cannot and do not dispute that National Union paid hundreds of claims, including four PTD claims without threat of litigation or arbitration. (SOF ¶¶ 33-34). No court applying Georgia law has held the existence of disputed claims, among paid claims, renders coverage illusory. There are compelling policy reasons why this Court should not be the first.

Insurers have the right to dispute a claim if there are "any reasonable ground for contesting" it. *Executive Risk Indem., Inc. v. AFC Enters., Inc.*, 510 F. Supp. 2d 1308, 1334 (N.D. Ga. 2007), *aff'd*, 279 F. App'x 793 (11th Cir. 2008).

6

Coverage disputes arise frequently and for any number of reasons that have nothing to do with misconduct, including incomplete claims submissions, ambiguous or inconclusive facts, and mistakes and errors. For this reason, courts do not presume bad faith merely from a decision to deny benefits, much less question the legitimacy of entire insurance programs. *E.g.*, *Williams*, 2007 WL 2479561, at *2 (denial not proof of insurance fraud).

The one pending coverage dispute illustrates why plaintiffs cannot use the fact that claims were litigated as evidence that National Union did not intend to pay claims. *Zodda v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, No. 2:13-cv-7738 (D.N.J.). Plaintiffs, attaching the *Zodda* complaint, assert that the mere fact that National Union denied the *Zodda* claim is evidence that the coverage was illusory. But the record in *Zodda* paints a very different picture. Because the beneficiaries in *Zodda* waited until four years after the accident and a year-and-a-half after the insured passed away to submit their claim, National Union was not able to conduct a medical examination to determine if the insured suffered a complete loss of speech. *Zodda*, Dkt. 144-1 at 5-6; Dkt. 145, ¶¶ 6-9, Exs. 4-7. Accordingly, National Union reviewed the insureds medical records, which noted that that the insured's "speech [was] clear, fluent and engaging" after the accident, including that he was "alert/talking" and "asking for things." *Id*. Dkt.

7

144-1 at 8-10, Dkt. 145 at ¶¶ 21, 24 and Exs. 19, 22.[4]  As a result, National Union denied the claim.  Regardless of whether plaintiffs believe that denial was correct, there is no evidence that the denial resulted from anything other than National Union's conclusion – based on the medical records[5] available to it – that the insured had not suffered a covered loss.  Thus, far from supporting plaintiffs' argument, *Zodda* underscores why the mere fact that a lawsuit was filed – or even settled – does not evidence that the coverage was illusory.

For similar reasons, the Court cannot find the program illusory because, in three instances, National Union entered into settlements (not judgments) over PTD claims.  (Dkt. 206 at 16).  As an initial matter, Federal Rule of Evidence 408 squarely prohibits plaintiffs from introducing settlements as proof of misconduct, precisely what plaintiffs attempt to do here.  Fed. R. Evid. 408; *Seebeck v. Gen. Motors Corp.*, No. 1:96-cv-449, 1996 WL 742914, at *1 (N.D. Ga. May 17, 1996)

---

[4] The beneficiaries initially claimed the insured lost the use of his legs, but appear to have conceded this argument due to the fact that the insured's medical records state the insured had such "good strength" in his legs that a "lap buddy was applied" to keep the insured from standing up. (Dkt. 144-1, 145-22).

[5] Plaintiffs' claim that National Union was "75% sure" *Zodda* would be "deemed payable" is untrue. (Dkt. 206 at 5).  The testimony that plaintiffs cite states that the beneficiaries' *claim form* suggested a 75% chance the loss was payable, but the insureds' medical records made clear to the claims handler and a peer review physician that the loss was not covered.  (Dkt. 206-17 at 63:8-67:5; 33:19).

8

(settlement checks inadmissible); *C & E Servs., Inc. v. Ashland Inc.*, 539 F. Supp. 2d 316, 318‑20 (D.D.C. 2008) (settlement of separate case is inadmissible to prove validity of claims). And, even if settlements were admissible to prove isolated breaches, a subsequent breach is not sufficient to prove a fraudulent intent at the time of contracting. *Gibson*, 327 Ga. App. at 84-85 ("fraud . . . does not result from a mere failure to perform") (quotation omitted); *Buckley v. Turner Heritage Homes, Inc.*, 248 Ga. App. 793, 795-96 (2001); *McCalla v. Royal Maccabees Life Ins. Co.*, 14 F. App'x 840, 843 (9th Cir. 2001) (a denial does not necessarily indicate bad faith, "even if the insurer ultimately turns out to be wrong"); *Williams*, 2007 WL 2479561, at *2 (denial does not prove insurance fraud).

Thus, on this record, plaintiffs cannot prove that National Union did not intend to pay claims based on the undisputed fact that National Union actually paid claims. Plaintiffs have not created a genuine issue as to any material fact.

### 2. Emails Written 8 Years After National Union Joined The Program Do Not Create a Triable Issue of Fact.

Plaintiffs do not (because they cannot) point to a single document from the time National Union joined the program (*i.e.*, 2004)[6] as evidence that National Union intended to create an illusory program that would never pay out benefits.

---

[6] While National Union decided to join the program in late 2004, its Coverage became effective January 1, 2005. (SOF ¶¶ 11, 13, 26).

9

Instead, they point to a handful of emails (out of thousands of pages disclosed during discovery) from eight years later that show that the program was not profitable in 2010-2012. The Court can dispense with this irrelevant evidence.

***First***, the emails state that National Union was losing money ***due to paid claims*** (*i.e.*, claims paid exceeded premiums) and accurately predicted that National Union would lose more money if the program was not terminated due to expected claims. (Pls' Ex. 8). As a result, rather than prove wrongful intent, the 2012/13 emails independently confirm that National Union expected to and did in fact pay real benefits to real people.

***Second***, while the 2012/13 emails discuss the financial situation of the HealthExtras Program in 2010-2012, they do not reflect the financial situation of the HealthExtras Program in 2004 – the only period that would be relevant to National Union's intent when it entered the program.[7] *Equifax*, 268 Ga. App. at 195 (holding letter from defendant's employee two years after agreement insufficient to prove lack of intent to perform at time of execution). Indeed, Ms. Hartman was employed at Citibank in 2004 and not even associated with National Union until 2010, which explains why her 2012/13 emails are silent on National

---

[7] Plaintiffs offer no admissible evidence for their assertion that National Union was losing money on the program in 2005.

Union's plans when it began underwriting *8 years earlier*. (Dkt. 206-9 at 11:14-19). Additionally, Ms. Hartman has no role in claims processing (*id.* at 12:6-13:16), and plaintiffs have offered no evidence even suggesting that her views about profitability in 2012 and 2013 ever impacted claims handling practices.

In short, plaintiffs are grasping at straws. Rather than the 2012/13 emails being evidence that National Union joined the program in 2004 knowing that it would systematically and repeatedly deny claims, they show that National Union was paying claims, and thus support summary judgment in its favor.

### 3. AD&D Benefits Payments Cannot Be Ignored.

In an effort to discount the real benefits distributed to insureds, plaintiffs argue that AD&D benefits "are **not** the subject of the lawsuit." (Dkt. 206 at 6 (emphasis in original)). The complaint does not exclude AD&D benefits. (Dkt. 77 ¶ 26)). To the contrary, plaintiffs previously argued (unsuccessfully) that both the AD&D and PTD benefits were void. (*Id.* ¶ 49 (defining "disability coverage" to include all of the coverages offered to HealthExtras members)). In all events, AD&D benefits account for only about $1.2 million of the $8.2 million in benefits paid. The remaining $7 million in benefits paid are more than sufficient to establish that National Union underwrote real insurance. (SOF ¶ 32, Ex. thereto).

\*   \*   \*

As this Court has held, the Coverage was valid and enforceable. (Dkt. 98 at 7). At all times, National Union was at risk. (*Id.* at 5). Having paid $8.2 million in benefits, National Union demonstrated that it stood by the insurance.[8] Thus, as a matter of law, plaintiffs have utterly failed to adduce competent evidence that they purchased illusory coverage. Having failed to do so, each alleged predicate act necessarily fails, and plaintiffs cannot prove injury. *E.g.*, *Adkins v. Cagle Foods JV, LLC*, 411 F.3d 1320, 1325 (11th Cir. 2005) (granting summary judgment on Georgia RICO claim where there was no evidence of fraudulent or deceptive communications); *Blanton v. Bank of Am.*, 256 Ga. App. 103, 105 (2002) ("Having failed to allege the predicate act on which he purported to base his civil RICO claim, Blanton was not entitled even to sue thereon."), *overruled on other grounds by Williams Gen. Corp. v. Stone*, 279 Ga. 428 (2005).

## II.   GEORGIA RICO CLAIM FAILS FOR ADDITIONAL REASONS.

### A.   National Union Did Not Enter Into A RICO Conspiracy.

Plaintiffs do not contend that there was an express agreement,

---

[8] At one point, plaintiffs suggest that National Union wrongfully failed to disclose that less than 10% of the overall membership fee was paid as premium to National Union. (*See* Dkt. 206 at 15). National Union owed no duty to disclose how HealthExtras used or allocated fees, so this purported nondisclosure cannot be a predicate act. *E.g.*, *Mitchell v. Ford Motor Credit Co.*, 68 F. Supp. 2d 1315, 1319 (N.D. Ga. 1998) (rejecting claim where "[i]n essence, her complaint is the failure to disclose a fee that was included within a total amount she agreed to pay").

12

understanding, or commitment between National Union and HealthExtras to commit the alleged predicate acts by issuing fictitious insurance. Nor does National Union take the position that "[a]n agreement to violate Georgia RICO [must] be express." (Dkt. 206 at 22). But, absent an express agreement, plaintiffs must offer admissible evidence supporting their contention that the defendants had a *joint* understanding that National Union would issue fictitious insurance (*i.e.*, that they had a joint understanding to commit the RICO predicate acts). (*Id.*). There is no such evidence.

National Union's conduct in paying $8.2 million in claims belies the existence of any alleged understanding to not pay claims. (SOF ¶¶ 32-34). Moreover, as plaintiffs admit, the negotiations between National Union and HealthExtras in 2004 occurred at arms-length (Dkt. 206-18 ¶ 18), which is consistent with the rest of the evidence reflecting an ordinary-course, arms-length business relationship. (SOF ¶¶ 12-18). Indeed, despite nearly a decade of National Union providing Coverage for the program (and nearly two years of discovery in this and related actions), plaintiffs do not point to a single document or any testimony that even remotely implies that defendants reached an understanding not to pay claims. There is no evidence from the negotiations in 2004 when National Union replaced Federal Insurance Company as underwriter for the Coverage, or in

any communication between the defendants between 2005 and 2014. This leaves plaintiffs speculating as to the existence of such an understanding, which of course cannot create a triable issue of fact. *Pabey v. State*, 262 Ga. App. 272, 276 (2003) (granting summary judgment on Georgia RICO conspiracy claim because "there is no competent evidence to support a finding of either a mutual understanding or a criminal objective"); *see also Fioretti v. CFI Mortgage*, 143 F. App'x 293, 2005 WL 2210215, at *1 (11th Cir. Sept. 13, 2005) (affirming summary judgment on RICO conspiracy claim based on insufficient evidence of illicit agreement).

### B.   Plaintiffs Do Not Identify a Person With Guilty Intent.

The record also is devoid of evidence that an identifiable employee at National Union possessed the requisite intent to enter a Georgia RICO conspiracy, as required by settled Eleventh Circuit law. To establish criminal intent against a corporate defendant, plaintiffs must demonstrate that a ***particular employee*** of the defendant acted with the requisite specific intent. (Dkt. 175-1 at 23; citing *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1243-44 (11th Cir. 2013)). Plaintiffs do not even attempt to identify such an employee.

Instead, plaintiffs try to distinguish *McGee* on its facts, arguing in a conclusory fashion that "[t]he record in this case is fundamentally different" from *McGee*, where "summary judgment was granted because the plaintiff failed to

present *any* evidence that any employee of the defendant acted with the requisite intent." (Dkt. 206 at 19 (emphasis in original)). Asserting that this case is "fundamentally different" does not make it so. Plaintiffs have the burden to point to record evidence of intent, and there is none, which is why the majority of plaintiffs' arguments attack *McGee* as wrongly decided. Those are not matters properly before this court. *See Webster v. Fulton Cty., Ga.*, 51 F. Supp. 2d 1354, 1367 (N.D. Ga. 1999) *aff'd*, 218 F.3d 1267 (11th Cir. 2000). Thus, plaintiffs' claims fail for the same reason as in *McGee*.[9]

## CONCLUSION

For the reasons stated herein and in National Union and Catamaran's moving papers (Dkts. 174, 175), National Union's motion should be granted.

Respectfully submitted,

Dated: February 19, 2016

/s/ Jonathan D. Parente
Jonathan D. Parente
Cari K. Dawson
Georgia Bar No. 213490

---

[9] Plaintiffs claim that "[n]o Georgia court has ever adopted (or even cited) *McGee*." (Dkt. 206 at 19). While no Georgia **state** court has relied on *McGee*, two district courts in Georgia recently relied on *McGee* for this very proposition. *Golden v. FNF Servicing, Inc.*, No. 1:13-cv-33, 2015 WL 5302703, at *8 (M.D. Ga. Sept. 10, 2015); *Goodwyn v. Capital One, N.A.*, No. 4:14-cv-219, 2015 WL 5120860, at *7 (M.D. Ga. Aug. 28, 2015). Further, *McGee* cannot be called into question by earlier judgments that were affirmed without reference to this requirement.

cari.dawson@alston.com
Jonathan D. Parente
Georgia Bar No. 425727
jonathan.parente@alston.com
ALSTON & BIRD LLP
One Atlantic Center
1201 W. Peachtree Street
Atlanta, GA  30309-3424
Telephone:  (404) 881-7000
Facsimile:   (404) 881-7777


Theodore R. Scarborough
tscarborough@sidley.com
Christopher M. Assise
cassise@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
Telephone:  (312) 853-7000
Facsimile:   (312) 853-7036

*Attorneys for Defendant
National Union Fire Insurance
Company of Pittsburgh, Pa.*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1D

I certify that the foregoing was prepared with 14-point Times New Roman font, in compliance with Local Rule 5.1.

Dated this 19th day of February, 2016.

*/s/ Jonathan D. Parente*

## CERTIFICATE OF SERVICE

I certify that I have this day electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will automatically send email notification of such filing to all attorneys of record.

Dated this 19th day of February, 2016.

<em>/s/ Jonathan D. Parente</em>

18